**In re DAYTON SEASIDE ASSOCIATES # 2, L.P., Dayton Seaside Associates # 3, L.P., Dayton Operating Company, L.P., Debtors.**

Nos. 00–10361 (ALG), 00–10363, 00–10364.

United States Bankruptcy Court, S.D. New York.

Dec. 22, 2000.

Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP, New York City, Thomas J. Fleming, Lisa N. Wall, of Counsel, for Debtors.

Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C., New York City, Robert R. Leinwand, Fred B. Ringel, of Counsel, for Debtors.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, Vincent D'Orazio, of Counsel, for the City of New York.

## OPINION AND ORDER

ALLAN L. GROPPER, Bankruptcy Judge.

The Debtors, Dayton Operating Company L.P., Dayton Seaside Associates #2 L.P., and Dayton Seaside Associates #3 L.P. (the "Debtors"), are New York limited partnerships and owners of high-rise apartment buildings located in Rockaway Beach, New York containing, in the aggregate, approximately 768 residential units. Each of the Debtors qualifies as a redevelopment company under Article V of New York's Private Housing Finance Law and is the successor to Dayton Seaside Corp. and to entities that in turn succeeded Dayton Seaside Corp.

The City of New York has filed proofs of claim against each of the Debtors, asserting tax claims and statutory liens therefor pursuant to the New York City Administrative Code ("Administrative Code") for the periods from January 1, 1985 through the petition date of February 2, 2000. The amounts claimed by the City are as follows:

| Debtor | Principal | Interest | Total Claim |
|---|---|---|---|
| Dayton Operating Co. | $3,454,216.13 | $14,720,116.89 | $18,174,333.02 |
| Dayton Seaside No. 2 | $3,456,389.79 | $19,719,440.39 | $23,175,839.18 |
| Dayton Seaside No. 3 | $3,311,554.23 | $19,400,363.70 | $22,711,917.93 |

Although, as will appear below, certain aspects of the City's tax claim have concededly been miscalculated, there is no dispute that this controversy involves allegedly unpaid taxes in the tens of millions of dollars going back more than 15 years. It is also obvious that interest claimed at the rate of 18 percent per annum, accruing daily, far exceeds the base tax claim. The Court understands that this tax claim may be the City's largest and oldest, and it is certainly a cause of the Debtors' latest filing under Chapter 11. It was apparently the cause of an earlier filing under Chapter 11 in the U.S. Bankruptcy Court for the Eastern District of New York, which was dismissed. Having survived for 15 years and been a cause of two bankruptcy cases, it is time for the claim to be resolved.

The dispute comes before this Court for resolution on the Debtors' objection to the City's proofs of claim. Both parties have moved for partial summary judgment in connection with resolution of the claims objection. Neither asks the Court to calculate the precise amounts of tax that may be due but instead to set forth the principles on which the taxes can be calculated. The Debtors contend that a review of the statutory and contractual record entitles them to a rate of return and corresponding tax exemptions that would eliminate the claimed taxes in whole or in large part. Although the Debtors' principal claim is based on construction of the applicable contract, as amended, and the underlying statutes, they also assert the City is estopped or precluded from collecting taxes and interest thereon by virtue of the City's past conduct, laches and "unclean hands." The Debtors also contend that they are entitled to tax exemptions for a period of 40 years rather than 25. The City's position is that analysis of the same record entitles it to judgment on the main issues, leaving open the Debtors' Third Objection (calculation of taxes during a post-exemption phase-in period), Seventh Objection

(disputing the City's calculation of the specific amounts due) and Eighth Objection (claiming the existence of certiorari proceedings for certain years, which could affect calculation of taxes for years at issue in the Objection). Both parties agree that the Court's determination of the City's proofs of claim constitutes a core issue under 28 U.S.C. § 157(b).

■■■■ The burden of proof in a bankruptcy case with respect to a tax obligation rests on the party who would have the burden in accordance with the underlying substantive law. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 23, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). Under the governing law of New York, the taxpayer has the burden of disputing a tax that has been assessed, and of establishing the right to a tax exemption. *Astoria Federal Savings and Loan Assoc. v. State of New York*, 222 A.D.2d 36, 42, 644 N.Y.S.2d 926, 931 (2d Dep't 1996), *appeal dismissed*, 88 N.Y.2d 1064, 674 N.E.2d 337, 651 N.Y.S.2d 407 (1996), *lv. app. denied*, 89 N.Y.2d 807, 678 N.E.2d 500, 655 N.Y.S.2d 887 (1997), *cert. denied*, 522 U.S. 808, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997). The burden of proof in this matter accordingly falls on the Debtors.

*The Private Housing Finance Law*

As noted above, each of the Debtors qualifies as a redevelopment company formed pursuant to Article V of the New York Private Housing Finance Law (PHFL), §§ 100 *et seq.* Article V was first adopted in 1942 to help provide low rent housing for persons of low income and for the clearance, reconstruction and rehabilitation of substandard areas. PHFL § 101; *Murray v. LaGuardia*, 291 N.Y. 320, 52 N.E.2d 884 (1943), *cert. denied*, 321 U.S. 771, 64 S.Ct. 530, 88 L.Ed. 1066 (1944). Article V of the PHFL provides for the formation of redevelopment companies (§ 103), makes them subject to the

supervision of a "supervising agency," gives them certain rights and privileges and subjects them to various restrictions.[1] Two sections of the PHFL are material to the resolution of this dispute. Section 107, entitled "Limited Return on Investment," contains the following provision:

> ...*there shall be paid annually out of the earnings* of the redevelopment company, after providing for all expenses, taxes and assessments a sum for interest on and amortization of any mortgage indebtness and depreciation charges if, when and to the extent deemed necessary by the supervising agency, *plus a distribution of six per centum on the capital and interest not exceeding six per centum on outstanding interest debentures...*
>
> ...in the case of redevelopment companies formed prior to April twenty-ninth nineteen hundred sixty [such as the Debtor Dayton Operating Company]... *there shall be paid annually out of the earnings* of the redevelopment company, after providing for all expenses, taxes and assessments, *a sum for interest, amortization, depreciation and dividends, equal to but not exceeding six per centum of the total actual final cost of the project* as defined by subdivision two of section one hundred twelve of this article; the obligation in respect of such payments shall be cumulative, and any deficiency in interest, amortization, depreciation and distributions in any year shall be paid either from any cash surplus derived from earnings remaining in the treasury of the redevelopment company in excess of the amount necessary to provide such cumulative annual sums or from the first available earnings in subsequent years...[emphasis added]

Although this section has been amended since the Debtors' predecessor was first formed, the key language, for purposes of determining this dispute, that there "shall

---

1. In New York City the supervising agency is now the Department of Housing Preservation and Development ("HPD"). PHFL § 102(2).

be paid" a six percent return, has not changed substantively.

The second material provision of Article V for purposes hereof is § 125, which provides, in pertinent part, "The local legislative body of any municipality in which a project of such company is or is to be located may by contract agree with any redevelopment company to exempt from local and municipal taxes, other than assessments for local improvements, all or part of the value of the property included in such project...." Section 125 goes on to provide various conditions and limitations on available tax exemptions. *See Cromwell Towers Redevelopment Co. v. City of Yonkers,* 41 N.Y.2d 1, 6, 359 N.E.2d 333, 336–337, 390 N.Y.S.2d 822, 826 (1976). When the Debtors' predecessor first contracted with the City, the period of tax exemption could not exceed twenty-five years. In 1969 § 125 was amended to provide that for a project that is permanently financed by a federally-aided mortgage, the tax exemption shall last for up to 40 years, so long as the mortgage remains outstanding.[2] McKinney's N.Y. Session Laws L.1969, c. 1121 § 2, amending PHFL § 125. When the tax exemptions provided to redevelopment companies under PHFL § 125 expire (whether after 25 or 40 years), redevelopment companies (including the Debtors) are entitled to a nine-year transitional period in which the level of taxes payable is gradually increased. N.Y. Real Property Tax Law (RPTL) § 423; *see Akari House v. Irizzary,* 81 Misc.2d 543, 366 N.Y.S.2d 955 (Sup.N.Y.Co.1975). At the end of the nine-year transitional period, redevelopment companies pay full taxes. RPTL § 423.

*The Debtors' Contract with the City of New York*

In 1959 the City, acting through the Board of Estimate, entered into an initial contract with the predecessor of the Debtors (the "Original Agreement"). After re-citing that the property was in a location in need of rehabilitation, the contract set out the terms under which the City would condemn and the Debtors' predecessor would purchase land from the City for the development of lower and middle income housing. For purposes hereof, two sections of the 1959 contract are particularly material. In § 407 the City granted the Debtors' predecessor a 25–year tax exemption equal to 40 percent of the value of the property included in the project ("Original Agreement" § 407.) In § 408, the contract limited rents to a specified amount per rental room per month, and further provided, "if the revenue derived from such rental together with all other revenues received by the Housing Company (including any Cash Surplus) should be insufficient to pay expenses, taxes and assessment of the Project and to provide an aggregate sum for interest, amortization, depreciation to the extent, if any, that it exceeds amortization and dividends equal to but not exceeding six per centum (6%) per annum of the total actual final cost of the Project...," the housing company could make application to the Board of Estimate for a rent increase, and if the deficiency in revenue were established by a preponderance of the credible evidence at a public hearing, "...the Board of Estimate shall grant the application to increase the maximum average rental per month per room...." If the increase were denied, the Housing Company had the right of judicial review pursuant to Article 78 of the New York CPLR, in addition to any other right or remedy available to it. Section 408 of the Original Agreement also provided for each rental lease to recite that the Housing Company could apply to the Board of Estimate for a rent increase under certain circumstances.

In order to determine whether a rent increase was required, §§ 407 and 408 set forth detailed principles for determining

---

2. When the Debtors' predecessor was formed, New York City's "local legislative body" entitled to contract under § 125 was the Board of Estimate; in 1989 the duties of the Board of Estimate devolved on the City Council. *See* New York City Charter § 21 (1989).

the project's "Cash Requirements." This formula took into consideration any available Cash Surplus, which was defined in the contract as "the amount remaining in the treasury of the Housing Company ... out of the accumulated earnings of the Housing Company, after providing for all expenses, taxes and assessments and a sum per annum for interest, amortization, depreciation, to the extent, if any, that it exceeds amortization and dividends, equal to but not exceeding six per centum (6%) of the total actual final cost of the project." Any Cash Surplus had to be accumulated in the Housing Company's treasury and would be available if rental and other revenues in subsequent years were not sufficient to cover the project's Cash Requirements. Original Agreement, § 409. These provisions generally carried out the requirements in PHFL § 107 with respect to calculation of the return to which a redevelopment company was entitled.

Section 408 of the Original Agreement also contained a clause providing certain protection to the owners of the project and their successors in interest "[i]n the event that the Project shall be in the possession of a receiver or trustee lawfully appointed or in the event of a foreclosure sale of the Project, or in the event of a delivery of a deed or deeds in lieu of foreclosure...." In such circumstances an application to increase rents did not have to be made to the Board of Estimate but could be served on the City Comptroller together with certain specified information, and if the Comptroller did not disapprove of such increase, it went into effect. If the Comptroller disapproved, an arbitration procedure would be commenced, with the possibility of judicial review.

The Original Agreement executed in 1959 was modified on at least six occasions over the next twenty-three years. The following amendments are all relevant to a determination of the present dispute.

1. In 1968 the parties modified Section 407 of the Original Agreement, providing Debtors' predecessor with an increased tax exemption in the near term, and reducing it in later years, in accordance with a formula they have termed "the sliding scale formula." This formula was essentially a graduated percentage, beginning with an exemption of 70% of the value of the project in the early years (starting in 1968) and tapering off to a 10% exemption in the final years of the twenty-five year tax abatement period.

2. In 1971, after holding a public hearing, the Board of Estimate adopted a resolution granting the Debtors' predecessor a lower rent increase than that requested, but offset the effect with an increase in tax exemption. The formula used for this additional tax exemption was the "shelter rent exemption," which was to be effective for the period from July 1, 1970 to June 30, 1973 and provided that the taxes paid for this period were to be ten percent of the annual "shelter rent." Section 33 of the PHFL at that time defined "shelter rent" as "the total rents received from the occupants of a project less the cost of providing to the occupants electricity, gas, heat and other utilities." The PHFL further provided that the amount of the shelter rent exemption "shall not be less than ten percent of the annual shelter rent or carrying charges of such rehabilitation project." The Board of Estimate action was documented in a contractual amendment, which also approved a proposed transfer of ownership of the project.

3. A further amendment was entered into in 1974 in which the Board of Estimate granted a rent increase and extended the shelter rent exemption for four years, from 1973 to June 30, 1977. As with the prior amendment, the tax exemption was granted retroactively, to July 1, 1973.

4. In 1980, a further extension of the shelter rent exemption, applicable from July 1, 1976 to December 1, 1984, was agreed to, with even greater retroactivity. (1980 Agreement, § 5). This same amendment provided for another rent increase and approved a transfer of title, subject to

HPD approval, to the three limited partnerships that are now the Debtors. The 1980 amendment also contains certain detailed provisions relating to the financing of the Debtors and the concomitant method of calculating of the rate of return to which the redevelopment companies would be entitled, including the concept of accumulated unpaid cash requirements or "UCR" (a new term that had the same meaning as the previous "Cash Requirements"). This Agreement specifically recited, "The provisions of this Agreement are intended to comply with the limitation on return on investment as set forth in Article V, Section 107 of the Private Housing Finance Law or any predecessor statute applicable to the Housing Project." (1980 Amendment, § 15).

5. A final amendment to the Original Agreement was entered into in 1982. This amendment recited that the shelter rent formula was in effect through December 1, 1984 (as provided in the 1980 modification). It provided the Debtors with certain limited rent increases, in return for which the Debtors agreed that there would be "no further rent increase pursuant to either Article V of the Private Housing Finance Law or any other statute, order or regulation" for certain specified periods. The amendment then recited that since the owners of the Debtors desired to join the Rent Stabilization Association and to subject all units to rent regulation under the rent stabilization program, and since the Board of Estimate had agreed, the Debtors could place the project under rent stabilization, and on the effectiveness thereof, that "the Board of Estimate shall no longer set rents for the Development Companies and that the Commissioner of the Department of Housing Preservation and Development will enter into an appropriate agreement to effect such transition with the Development Companies." In other words, rent regulation with respect to the Debtors would generally be transferred from the political process to the rent stabilization program, which regulates and limits rents but also provides for periodic rent increases to landlords depending on market factors, and hardship increases under certain circumstances. *See* the Emergency Tenant Protection Act of 1974, currently codified at N.Y. Unconsol. Laws (McKinney's) after § 8621; New York City Rent Stabilization Code, currently codified at NYC Admin. Code § 26–501 et seq.

The 1982 amendment also released the City from certain claims and resolved certain other matters. Paragraph 5, on which the Debtors place great weight, provided as follows:

> The provisions of this Amendatory Agreement shall not be deemed to supercede the requirements and limitations of Article V of the Private Housing Finance Law with regard to payout on dividends, payout of future UCR or repayment of future loans to the Housing Company or the investors thereof, and the obligation of the Housing Company, and its successors, to submit annual financial information to the Department of Housing Preservation and Development as required under the Private Housing Finance Law.

*Events Subsequent to the 1982 Amendment*

The 1982 amendment is the last modification to the 1959 Original Agreement agreed to by parties. As indicated, this amendment in § 4 recited the fact that the "shelter rent exemption," originally granted in 1980, "is to remain in effect through December 1, 1984." Thereafter the Debtors' tax obligations to the City of New York were never settled.

The following events subsequent to 1984 with respect to the Debtor's tax obligations are clear on the record before the Court. In 1984 counsel for the Debtors' predecessor sought a further three-year extension of the shelter rent exemption that would

run from 1984 to December 1987.[3] The request remained under consideration for several years; in 1987 the City demanded a complete review of the Debtors' books and records, in order to determine its revenues, cash surplus and any cash requirements and whether it was earning a rate of return of more than the six percent provided for in the Original Agreement and in the PHFL. After this review, which also took several years, HPD sent to the City Council, which had succeeded to the powers of the Board of Estimate under the new City Charter, a submission dated June 18, 1991 recommending that the Debtors be granted a partial real property tax exemption, pursuant to § 125 of the PHFL, for the years 1985 through a date stated to be the end of the three Debtors' respective 25–year tax abatement periods (1988, 1989 and 1992, respectively). HPD's letter stated that it had reviewed the Debtors' books to determine "the return on equity permitted under the PHFL and reasonable reserves for replacements."

The City Council apparently had the HPD submission under consideration for years. In 1992, even before it became apparent that the tax exemption recommended by HPD would not be approved, two of the Debtors, faced with ever-growing tax claims, filed Chapter 11 proceedings in the Eastern District of New York. *In re Dayton Seaside Associates No. 2,* Case No. 892–84576–478, and *In re Dayton Seaside Associates No. 3,* Case No. 892–84517–478 (E.D.N.Y.). Those proceedings were dismissed in 1995 for inability of the Debtors to effectuate a plan, with the tax issues unresolved. The result is a 15–year period in which some taxes now claimed by the City have not been paid and a dispute which is at the very least ripe, if not overripe, for decision.

The record of the City's effort to collect taxes from the Debtors, and the Debtors' sporadic payment of taxes after 1984 is not altogether clear. The Debtors claim broadly that "the City continued to treat the project as if it still enjoyed the [shelter rent] exemption on the theory that it was only a matter of time before the Board of Estimate once again reinstated the exemption retroactively. During these years, tax bills were not rendered to the Debtors or alternatively, bills showing no taxes due were submitted." Debtors' Objection to City's Proofs of Claim, ¶ 36. It is not disputed that the Debtors were sent at least one bill showing no taxes due; the City claims that the bill was in error (the Debtors were never wholly exempt from taxes), that the bill was corrected in 1987 shortly after it was issued (the correction itself being in error, as the new bill showed full taxes due, whereas the City now concedes that the Debtors were entitled to the sliding scale exemption for the years in question), and that subsequent bills were sent to the mortgagees of the property in accordance with established procedures requested by the Debtors themselves. Some taxes may have been paid from escrows maintained by the mortgagees, and some taxes were apparently paid by a receiver whom a mortgagee temporarily placed in charge of the property. The Debtors allege that over the course of many years the City was unable even to render a bill for taxes, and the Debtors refrained from seeking rent increases in reliance on the City's commitment to act. The Debtors further allege that the City Council reported to the Bankruptcy Court on many occasions in the prior cases that City Council action was imminent, up to March 1995 when counsel said that no further forecast could be made. Although they have not put the letters into the record, the Debtors

---

3. Counsel's letter stated: "If the tax exemption were to expire by its terms on December 31, 1984, the Applicants would have no option but to apply for a rent increase to provide the additional revenues necessary to pay the increased taxes. Under the 1959 Agreement, the Applicants may recoup the entire cost of these taxes in increased rents, since the increase in taxes would result in a direct increase in the cash requirements of the Projects."

contend that as late as 1996 and 1997, Queens Borough President Shulman, NYC Council Member Stabile and HPD Commissioner Barrios–Paoli all sent the Debtor letters requesting that the Debtors forego rent increases on the assurance that City action was imminent.

Since 1995 the Debtors have been paying taxes in full under protest. In any event, while it is an overstatement for the Debtors to contend that the City gave up billing and collecting taxes altogether, the Debtors doubtless assumed for many years that they would ultimately get a retroactive extension of the shelter rent exemption, as they had several times in the past, and HPD may have assumed the same.

The record also contains a letter dated August 26, 1991 from Simon G. Salas, the Deputy Commissioner for Legal Affairs of the City Department of Finance, to the Deputy General Counsel of HPD (the "Salas Letter") in which counsel responded to an inquiry regarding the assessment of interest on late payment of real estate taxes by the Dayton Seaside Project. The letter states that the Department does not have any discretion to waive interest but that "a critical issue is when the real property tax will become 'due and payable,' as it is from this date that interest will be assessed." The letter continued:

> The Department of Finance recognizes that housing companies granted tax exemptions under the Private Housing Finance Law or the Real Property Tax Law sometimes encounter difficulties in receiving timely tax bills because of the time it takes the City to perform the various calculations involved in determining the tax. Often certain information must be sent to the Department of Finance from HPD or other agencies before the tax due can be calculated. This procedure may lead to taxes being imposed for the fiscal year after the statutory due date of July 1. See Charter § 1519 for dates real property taxes become due and payable.

> Given the above situation, the Department of Finance does not treat the taxes of a subject housing company as "due and payable" for the purpose of charging interest until such taxes are calculated and placed upon the City's records, and the housing company is billed for the taxes.

> Thus, any interest assessed for the late payment of real property tax by the subject housing companies should be calculated from the date the tax is imposed on the City's records and the housing company is billed, until the date of payment. The Department will provide a two week grace period for payment in accordance with the provisions of the Code. See §§ 11–224(f) and (k).

The Debtors contend that they first became aware of this inter-departmental letter in the fall of 1991, and that they relied on it. The City in turn claims that the letter contains only internal advice with respect to the calculation of interest where the actual amount of real property taxes cannot be calculated by July 1, the due date for the first half of the tax year. Where information is lacking, such as when taxes are calculated pursuant to the "shelter rent exemption" (which requires certified data from the taxpayer on rent, fuel and utility costs), the City asserts that its practice is to send out a bill based on "an estimated shelter rent," which "must be paid as would any other tax bill. Once all the data is reviewed, an adjusted tax bill goes out reflecting any changes in the estimated shelter rent. A change could be either above or below the estimate in the amount of tax due. In the case of an upward adjustment, interest is not assessed back to the date of the estimated shelter rent bill; rather it would begin to be assessed at the time payment is due on the amount indicated on the adjusted bill." Declaration of Devora Cohn, Associate Commissioner in the Office of Legal Affairs of the Department of Finance of New York City, and a recipient of the Salas letter when it was first issued.

Dayton continued its quest for the shelter rent tax exemption though the mid-nineties. Contrary to Debtors' expectations, however, the City Council never approved the HPD proposal.

On September 30, 1999, the City brought a foreclosure action against the Debtors pursuant to Tile 11 of the Administrative Code of the City of New York § 11–354, seeking to foreclose on asserted tax liens. On February 2, 2000 the three Debtors filed under Chapter 11. These cases are being jointly administered by this Court.

The Debtors have filed nine objections to the City's proofs of claim. The First Objection contends that the City's tax claims are wholly barred by virtue of the PHFL and the Agreements identified above, and the Third Objection alleges that as a result the nine-year phase-in period under RPTL § 423 was also miscalculated. The Second Objection contends that the City's conduct estops it from pursuing its tax claims, and the Fifth and Sixth Objections make similar contentions based on the City's alleged "unclean hands" and "laches." The Fourth Objection contends that the City is precluded from seeking interest by virtue of its past conduct. The Seventh and Eighth Objections object to the calculation of amount due, and the Ninth Objection contends that the Debtors are entitled to a 40–year exemption rather than one of 25 years.

The matter now comes before the court on cross-motions for summary judgment pursuant to Bankruptcy Rule 7056. The City has also moved to dismiss under Bankruptcy Rule 7012(b) for failure to state a claim upon which relief may be granted.

*Statute of Limitations Defense*

■ In its motion to dismiss the City raises the preliminary defense of a statute of limitations bar to all or substantially all of the Debtors' claims. In New York, contract claims are subject to a six year statute of limitations under CPLR 213(2).

A cause of action for breach of contract arises at the time of the breach. *See Ely–Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 402, 615 N.E.2d 985, 986, 599 N.Y.S.2d 501 (1993). The City argues that if it breached any contractual obligation to the Debtors, it did so more than six years before the Debtors filed for Chapter 11 protection in this Court.

■ Whether or not the Debtors' claims would be time barred in an action against the City, they come before the Court as a defense to the City's proofs of claim. No independent recovery is sought by the Debtors. Under these circumstances the Debtors allege that the applicable statutory provision is CPLR 203(d):

> A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

CPLR 203(d) is based on the doctrine of equitable recoupment, which permits the revival of an affirmative defense or claim for offset purposes, even if such claim would otherwise be time barred if it were pursued affirmatively. *See Bull v. United States,* 295 U.S. 247, 261–262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *118 East 60th Owners, Inc. v. Bonner Properties, Inc.,* 677 F.2d 200 (2d Cir.1982); *Bloor v. Shapiro,* 32 B.R. 993, 1002 (S.D.N.Y.1983).

All of the conditions for application of the doctrine of equitable recoupment are present here. The filing of a proof of claim has properly been analogized to the filing of a complaint, with the debtor's objection the answer or defense. *See Nortex Trading Corp. v. Newfield,* 311 F.2d 163, 164 (2d Cir.1962)(Bankruptcy Act case); *Smith v. Dowden,* 47 F.3d 940, 941, 943 (8th Cir.1995); *In re ²⁰⁄₂₀ Sport, Inc.,*

200 B.R. 972, 978 (Bankr.S.D.N.Y.1996). The defense here also arises from the same transactions or series of transactions upon which the proofs of claim depend. Further, there has never been a proceeding in which the City's tax claims have actually been litigated, and the bankruptcy claims process is not being used as a means of reiterating issues that were previously the subject of another case that has res judicata or collateral estoppel effect. *Compare In re Bentley,* 47 B.R. 269, 271, n. 2 (Bankr.S.D.N.Y.1985), where the Court held that equitable recoupment could not justify the treatment of a proof of claim as a complaint to revive a barred defense where there had been an earlier litigation in which the debtor had defaulted. Here the Debtors would have had the opportunity to raise their defenses had the City pursued its alleged tax claims and liens in State court or in a foreclosure proceeding. The Debtors should have the same opportunity to raise their defenses in this Court. *Cf. Raleigh v. Illinois Dept. of Revenue, supra.*

■ At the same time, however, it should be noted that in New York the doctrine of equitable recoupment is limited. Although a defendant may defend against a contract claim, the doctrine does not permit it to reform the agreement or to seek damages independently for matters involving the negotiation or execution of the contract. See *SCM Corp. v. Fisher Park Lane Co.,* 40 N.Y.2d 788, 358 N.E.2d 1024, 390 N.Y.S.2d 398 (1976); *182 Franklin Street Holding Corp. v. Franklin Pierrepont Assocs.,* 217 A.D.2d 508, 509–510, 630 N.Y.S.2d 64, 65–66 (1st Dep't 1995).

■ The City also contends that N.Y. Admin. Code § 7–201 required the Debtors to file a notice of claim as a condition precedent to filing a claim against the City.[4] Where a defendant is relying on the doctrine of equitable recoupment, the New York courts have held that failure to file a claim against a municipality is not a defense. *Town of Amherst v. County of Erie,* 247 A.D.2d 869, 870, 668 N.Y.S.2d 848 (4th Dep't 1998); *Hart v. East Plaza,* 62 A.D.2d 113, 117, 403 N.Y.S.2d 928, 930 (4th Dep't 1978), *lv. app. dismissed,* 45 N.Y.2d 706, 408 N.Y.S.2d 1025, 380 N.E.2d 338 (1978).

*Summary Judgment as to the Contract Claims*

Summary judgment may be granted by the Court when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Bankr.P. 7056, incorporating Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of proof is on the party moving for summary judgment. *Id.* at 323, 106 S.Ct. 2548. If the motion is properly made, the burden shifts to the non-moving party, who "must set forth specific facts showing that there is a genuine issue for trial". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine and precludes summary judgment when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. In evaluating whether a genuine issue of material fact exists, the court must "assess the record in the light most favorable to the non-movant and ... draw all

---

4. § 7–201 Actions against the City

 (a) In every action or special proceeding prosecuted or maintained against the City, the complaint or necessary moving papers shall contain an allegation that at least thirty days have elapsed since the demand, claim or claims upon which such action or special proceeding is founded, were presented to the comptroller for adjustment, and that the comptroller has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.

reasonable inferences in its favor." *Id.* at 255, 106 S.Ct. 2505.

In a contract case, summary judgment is appropriate only when the language of the contract is unambiguous. *Bouzo v. Citibank,* 96 F.3d 51, 58 (2d Cir.1996). The terms of an integrated contract are ambiguous if they may have more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996). There is no ambiguity if the contractual terms have a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference in opinion. *Id.* at 1192. Even when parties dispute the meaning of specific contract clauses, the Court's task is "to determine whether such clauses are ambiguous when read in the context of the entire agreement." *Id.* Parties may not create an ambiguity merely by urging conflicting interpretations of their agreement. *United States v. 0.35 of an Acre of Land,* 706 F.Supp. 1064, 1070 (S.D.N.Y.1988). When the language is ambiguous, but there is relevant extrinsic evidence that in turn creates no genuine issue of material fact and permits interpretation of the agreements as a matter of law, summary judgment is still permissible. *Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153 (2d Cir.2000).

As noted above, both parties have moved for summary judgment as to the construction of the underlying contract. The fact that both parties claim the same contract is wholly clear does not mean that summary judgment must be granted, especially where the parties derive different meanings from the same document. *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151–152 (2d Cir.1990). Nevertheless, the Court finds that there is no ambiguity in the Original Agreement, or the Agreement as it was amended through the series of modifications detailed above. Nor is any ambiguity created by the fact that the Agreement was at all times intended to comply with the PHFL and in effect incorporated the relevant provisions of the PHFL. The Court further holds that as to the Debtors' objections based on construction of the contract and the underlying PHFL (the First Objection), summary judgment should be entered in favor of the City and the Debtors' objections overruled in principle (without any finding at this time as to the specific taxes due).

The first prong of the Debtors' argument is that the Original Agreement, as amended, was at all times intended to comply with and/or incorporated the PHFL and that at all times the PHFL entitled the Debtors to a six percent return on investment. For purposes of the instant motions, the Court will accept the proposition that under the Original Agreement as amended and the PHFL the Debtors are entitled to a six percent return. *Cf. Winthrop Gardens, Inc. v. Goodwin,* 58 A.D.2d 764, 396 N.Y.S.2d 400 (1st Dep't 1977) (Article II limited-profit housing company). But it is another matter altogether to accept the second prong of the Debtors' argument and read into the statute and the contract a requirement that the City increase the Debtors' tax exemption to assure the Debtors this return.

Turning first to the statute, nothing therein specifically requires a municipality to guarantee a return by granting tax exemptions. Section 107 of the PHFL, relied on by the Debtors, contains certain specific provisions that are obviously designed to result in an overall six percent return, providing for example for cash surpluses in good years to be retained by redevelopment companies and for their use in lean years. Other sections of the statute allow a municipality to grant tax ex-

emptions and provide for regulation of the rent that can be charged to the tenants of redevelopment companies, but there is no direction in the statute that either exemptions or rent increases must provide the owner with the return to which it is entitled. There is certainly no explicit requirement in the statute that the municipality make up any shortfall. Nor has any case been cited in which the New York courts have construed the statute to require a municipality to make up a shortfall in the required rate of return. The Debtors rely on *Cromwell Towers Redevelopment Co. v. City of Yonkers, supra,* 41 N.Y.2d 1, 390 N.Y.S.2d 822, 359 N.E.2d 333 (1976), for the proposition that a redevelopment company under Article V of the PHFL is entitled to a six percent rate of return and that the statute should be read in the light of the purpose for which it was drafted. Although *Cromwell* stated that the granting of local tax exemption is part of the overall State and Federal policy of encouraging redevelopment projects, the Court there simply held that a contract between a municipality and a redevelopment company would be enforced by the courts. There is no holding whatsoever relating to the use of tax exemptions to guarantee a six percent return.[5]

Turning next to the contracts at issue, the Original Agreement is devoid of any language requiring the City of New York to make up shortfalls in the six percent return by means of tax exemptions. The Agreement did not ignore the owners'

right to a return, however, and it did not ignore the fact that there might be political pressure against the rent increases that might be necessary to achieve the return. Section 408 of the Original Agreement, quoted above, states explicitly that the Housing Company could apply to the Board of Estimate for a rent increase if it did not achieve the return to which it was entitled, and if the deficiency in revenues were established by a preponderance of the credible evidence at a public hearing, the Agreement provided that "the Board of Estimate *shall* grant the application to increase the maximum average rental per month per room..." (emphasis supplied) If the increase were denied by the Board of Estimate, the redevelopment company was entitled to judicial review.[6] There is a further clause in § 408 providing for the Board of Estimate to be circumvented altogether in the event rent increases were needed and the project was in the possession of a receiver or trustee or had been foreclosed; in such circumstances, the City Comptroller could be provided with certain data and the increase would go into effect if he did not disapprove of it. The Original Agreement thus did not ignore the fact that the Debtors were entitled to a six percent return and might find it difficult to raise rents to achieve that goal, but the availability of an express remedy in the Original Agreement contradicts the Debtors' argument that the parties intended to require the City to provide offsetting tax

5. In *Branford House, Inc. v. Michetti,* 81 N.Y.2d 681, 688, 623 N.E.2d 11, 15, 603 N.Y.S.2d 290, the New York Court of Appeals described as follows the "carefully balanced bargain between the investors and the governmental entities created by the statutory scheme of the Private Housing Finance Law" (in that case, pursuant to Article II thereof, providing for limited-profit companies, which for present purposes are similar to redevelopment companies formed under Article V of the PHFL): "the investors agree to a 6% per year limit on the profit they may earn and to be subject to rent regulation while operating as a limited-profit housing company in return for receiving long-term, low-interest govern-

ment loans and tax exemptions." The Debtors, redevelopment companies formed under Article V of the PHFL, did not receive long-term loans from the City.

6. Absent the provisions permitting judicial review of the action of the Board of Estimate, its determination might have been considered discretionary legislative action not subject to judicial review. *Kaskel v. Impellitteri,* 306 N.Y. 73, 115 N.E.2d 659 (1953), *cert. denied,* 347 U.S. 934, 74 S.Ct. 629, 98 L.Ed. 1085 (1954); *Goodstein Constr., Corp. v. City of New York,* 80 N.Y.2d 366, 372, 604 N.E.2d 1356, 1360, 590 N.Y.S.2d 425, 428 (1992).

exemptions if the return could not be obtained.

Over the course of many years subsequent to the signing of the Original Agreement in 1959, the City and the Debtors' predecessors agreed on increased tax exemptions that doubtless augmented the Debtors' revenues (and avoided rent increases as well). There is also no question that over the years the parties used tax exemptions more prominently as a means of maintaining the redevelopment companies' rates of return. Nevertheless there in no explicit language in the amendments to the Original Agreement requiring that the City agree to tax exemptions that would result in a six percent rate of return if rents could not be raised sufficiently to achieve this result; on the contrary, the 1982 Agreement dealt with the issue of tax exemption in a manner that does not comport with Debtors' argument. It reiterated that the shelter rent exemption was in effect until 1984.

■■■ Debtors rely strongly on language in the 1982 amendment that provided that such modification "shall not be deemed to supercede the *requirements* and limitations of Article V of the Private Housing Finance Law..." 1982 Amendment, § 5, (emphasis added); *see also* 1980 Amendment, § 10, which is similar. Debtors also cite a provision in the 1982 amendment that recited, "The provisions of this Agreement are intended to comply with the limitation on return on investment as set forth in Article V, section 107 of the Private Housing Finance Law or any predecessor statute applicable to the Housing Project." 1982 Amendment, § 7. However, neither the PHFL nor these provisions required that tax exemptions be used to provide the Debtors with the return to which they were entitled. Nor can any such a requirement, which would amount to a guaranteed City subsidy, be fairly implied. The obligation to pay taxes arises by virtue of law, and it is a right to an exemption that the Debtors have to find; moreover, under the governing law of New York,

exemptions are construed against a taxpayer and entitlement thereto much be clear and unambiguous. *Matter of Grace v. New York State Tax Comm'n,* 37 N.Y.2d 193, 195–197, 332 N.E.2d 886, 371 N.Y.S.2d 715, 718 (1975), *appeal denied,* 37 N.Y.2d 708, 338 N.E.2d 330, 375 N.Y.S.2d 1027 (1975); *Moran Towing and Transp. Co., Inc. v. New York State Tax Comm'n.,* 72 N.Y.2d 166, 172–173, 527 N.E.2d 763, 766–767, 531 N.Y.S.2d 885, 888 (1988).

Nor is the issue one of the City's breach of an implied covenant of fair dealing and good faith, as the Debtors also argue, citing *Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 632, 427 N.Y.S.2d 301, 302 (2d Dep't 1980), *aff'd,* 52 N.Y.2d 594, 421 N.E.2d 818, 439 N.Y.S.2d 326 (1981). There the New York court stated the covenant is breached "only where one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other." *Id.* at 632, 427 N.Y.S.2d 301. A party does not withhold the benefits of a contract from another by adhering to the economic terms agreed to and refusing to increase a subsidy.

The 1982 amendment to the Original Agreement also provided that the Debtors would join the Rent Stabilization Association, that their rental units would become subject to the rent stabilization laws, and that the Board of Estimate would no longer have jurisdiction over the rents. The rent stabilization laws generally permit a landlord to enter into leases with tenants that allow periodic rent increases depending on the length of the leases; the size of the increase is set by a Board called the Rent Guidelines Board. *See, generally, Rent Stabilization Ass'n of the City of New York v. Dinkins,* 5 F.3d 591 (2d Cir. 1993). The Debtors state that the remedies under rent stabilization were inadequate to provide rent increases they might need. They assert specifically that after 1982, rental increases beyond the annual increases available to all landlords were permitted under rent stabilization only for

"comparative hardship" and where "major capital improvements" had been made. *See* former NYC Admin. Code § YY51–6.0 (c)(6). They contend that neither of these was practically available to give the Debtors effective relief, and that the "alternative hardship" increase adopted in 1986 was also unavailing as a practical matter. *See* the 1986 recodification of the Rent Stabilization Laws at NYC Admin. Code §§ 26–511(6–a) and § 2522.4(c) of the Rent Stabilization Code. They do not explain why the inadequacies of the rent stabilization laws were not known to them or discoverable prior to the time they agreed to the 1982 Amendment. Moreover, the Debtors gloss over the benefit of periodic rent increases they received by adhering to rent stabilization.

The 1982 Amendment may have vitiated the protection that § 408 of the Original Agreement contained. That Agreement previously provided that the Board of Estimate "shall" approve rent increases; now the Debtors would be generally relegated to an administrative process that may not have been adequate to assure a six percent return. But the Debtors do not argue that the City defrauded or misled them into adhering to rent stabilization, and there is nothing in the history that would indicate the City should be responsible for inadequacies in an administrative process that the Debtors chose.

Moreover, the Debtors chose in 1982 to adhere to rent stabilization while not dealing contemporaneously with the issue of an extension of the current, shelter rent exemption. The exemption, which was in effect in 1982, ran until 1984, and the Debtors waited until 1984 before formally asking for an extension of the exemption. There is no contention that the City forced or misled them into this strategy. Similarly, although both the Debtors and HPD, the supervising City agency, may have assumed that the development companies would eventually get another shelter rent tax exemption, and although HPD recommended such an exemption to the City

Council in 1991 (a proposal which the Debtors apparently endorsed), there is no claim that the City was bound by the action of the HPD as a matter of contract. *See Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 372–374, 604 N.E.2d 1356, 1361, 590 N.Y.S.2d 425, (1992) (where New York City terminated plaintiff's exclusive right to negotiate the terms of a land disposition agreement, the court found that the plaintiff had no basis for recovery of damages for loss of anticipated profits in that, among other things, the agreements and the then existing law expressly conditioned the City's contractual obligation on final approval by the Board of Estimate.); *see also Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d 312, 321–322, 537 N.E.2d 176, 180–181, 540 N.Y.S.2d 1 (1989), *appeal dismissed,* 74 N.Y.2d 712, 541 N.E.2d 422, 543 N.Y.S.2d 393 (1989).

In the same section of the 1982 amendment that provided that the Debtors would become subject to rent stabilization and that the Board of Estimate would no longer set rents, it was also provided that "the Commissioner of the Department of Housing Preservation and Development will enter into an appropriate agreement to effect such transition with the Development Companies." 1982 amendment, § 8. It is not material on these motions whether such an agreement was entered into; the Debtors argue that the 1991 HPD letter to the City Council constituted such an agreement. In any event, the Debtors at oral argument disclaimed any intention to seek to enforce an "agreement to agree" by the City on a tax exemption, nor could one fairly be implied from the record before the Court. *Cf. Baxter v. County of Suffolk*, 201 A.D.2d 603, 604, 607 N.Y.S.2d 972 (2d Dep't 1994).

 In their reply papers the Debtors contend for the first time that the City's failure to grant an increase that would permit them to earn the expected rate of return frustrated the purpose of the contract, and that the City cannot now take action (e.g., collect taxes) that

would deprive them of the benefit of the agreement. A party can obtain relief if the purpose of a contract has become frustrated or, as more usually stated today, performance of the contract has become "impracticable." The Restatement 2d *Contracts* § 261 (1981) states the basic rule as follows:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

In New York, performance must be rendered impracticable because of circumstances that were not foreseeable at the time the contract was entered into, or stated differently, without the "assumption of the risk" by the party seeking relief. *See 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 344, 244 N.E.2d 37 (1968); *Maple Farms, Inc. v. City School District*, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. Chemung Co.1974); Restatement 2d, *Contracts* § 261 (1981).

The Debtors have not shown that the 1982 Amendment frustrated the purpose of the Agreement without their fault or their "assumption of the risk." The inadequacies of rent stabilization were known to them or could have been ascertained on this point. Indeed, the Debtors now assert that the deficiencies in the rent stabilization procedures with respect to the grant of hardship increases are "notorious." (Debtors' Reply Memorandum of Law in Support of Debtors' Motion for Partial Summary Judgment on the City's Claims and in Opposition to the City's Cross–Motion, 28 n 4). In any event, the relief accorded in the event of impractica-

bility is ordinarily to discharge the complaining party from future performance. The Debtors do not argue for rescission, however, because it would not result in the tax exemption that they seek. The PHFL and the Original Agreement clearly require that an exemption be granted; its not, as the Debtors argue, that the City can be precluded from collecting taxes under the PHFL and the parties' agreement.[7] In limited circumstances, where a party which is itself without fault has demonstrated that performance is impractical, the courts have implied a contractual term to avoid manifest injustice. Restatement 2d, *Contracts* § 272(2) (1981). Assuming *arguendo* that the City's collection of taxes above a certain level would frustrate the purpose of the contract, the Court cannot rewrite the parties' agreement and provide an affirmative tax exemption they never agreed to. This is especially true where the contractual amendment at issue specifically recited that the shelter rent exemption was in effect until 1984.

*Estoppel*

The Debtors argue that actions of New York City subsequent to the expiration of the express shelter rent exemption in 1984 prevent the City from collecting taxes by virtue of application of the doctrine of estoppel. The Debtors claim generally that the City failed to bill them for taxes for years after 1984, that it sent one bill showing no tax due, and that it generally acknowledged that the Debtors' tax status was uncertain—at least until the mid or late 1990's. The City counters that tax bills were sent to the Debtors' mortgagees and that some taxes were paid, that the one bill showing no tax due was obviously in error and was corrected, and that the obligation to pay real estate taxes arises by law and does not depend on the receipt of tax bills. See RPTL § 922(3), which provides that "the failure to mail any such

---

7. Where a contract "contains no inherent ambiguity or uncertainty courts are hesitant, under the guise of judicial construction, to imply additional requirements to relieve a party from an asserted disadvantage following from the terms used." *United States v. 0.35 of an Acre of Land*, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988).

statement [tax bill] or the failure of the addressee to receive the same, shall not in any affect the validity of the taxes or interest prescribed by law with respect thereto"; *see also* NYC Administrative Code § 11–416(b), which similarly provides that

> The commissioner of finance shall mail bills for taxes, charges and assessments to all owners who have filed owner's registration cards as herein provided, but the failure of the commissioner of finance so to mail such a bill shall not invalidate or otherwise affect the tax, charge or assessment represented thereby nor prevent the accruing of any interest or penalty imposed for the non-payment thereof, nor prevent or stay proceedings under this chapter, nor affect the title of the plaintiff or any purchaser under such proceedings.

 In New York estoppel will lie against a governmental entity in matters involving the collection of taxes when there are present "unusual circumstances that would support a finding of 'manifest injustice.'" *Matter of Diaz v. Tax Appeals Tribunal of State of New York*, 243 A.D.2d 995, 997, 663 N.Y.S.2d 684 (3d Dep't 1997); *see also, Matter of 1555 Boston Road Corp. v. Finance Administrator of the City of New York*, 61 A.D.2d 187, 192, 401 N.Y.S.2d 536, 539 (2d Dep't 1978); *Matter of Mendick v. Sterling*, 83 A.D.2d 749, 443 N.Y.S.2d 508 (4th Dep't 1981); *Matter of Foreclosure of Tax Liens by the City of New York*, 102 Misc.2d 801, 805, 424 N.Y.S.2d 585 (Sup.Ct., N.Y.Co., 1979). The courts found the facts in those cases to be sufficiently egregious to overcome the principle restated by the New York Court of Appeals in *Frye v. Comm'r of Finance of the City of New York*, "As we have held many times, estoppel is not available against a government agency in the exercise of its governmental functions." 62 N.Y.2d 841, 844, 466 N.E.2d 151, 477 N.Y.S.2d 611, 612–613 (1984); *See also Granada Bldgs., Inc. v. City of Kingston*, 58 N.Y.2d 705, 708, 444 N.E.2d 1325,

458 N.Y.S.2d 906 (1982), *rehearing denied*, 58 N.Y.2d 825, 445 N.E.2d 657, 459 N.Y.S.2d 1031 (1983) (in a case involving an unauthorized grant of a tax exemption under PHFL § 125, the court stated: "We have frequently reiterated that estoppel is unavailable against a public agency.")

 As noted above, the Debtors support their estoppel argument by pointing to the years of negotiation over a further tax exemption, to the fact that the City sent at least one bill showing no tax due, then sent them no bills at all for many years. There is however, no dispute that the tax issue was the subject of intense attention after 1984. The Debtors spent years negotiating with the City over a further extension of the shelter rent exemption, and they obtained HPD's agreement but not the consent of the entity with authority. If a taxpayer could estop the tax collector altogether on the basis of a long period of negotiations with agency officials that did not end in an agreement, it could avoid the legal requirement that the exemption ultimately be approved by the governmental entity with authority, a result that would impede the collection of taxes as well as the process of settling disputes through negotiations.

On a motion for summary judgment it is the burden of a party seeking to establish a position or to prevail over a defense to bring forward facts that support its position. Fed.R.Bankr.P. 7056, incorporating Fed.R.Civ.P. 56(c). The Debtors here have demonstrated at best that both parties assumed that a further extension would be granted, that the City failed to bring the matter to a head for many, many years and that an enormous tax bill (and an even larger interest bill) has built up. The Debtors have not set forth specific facts showing that City representatives made promises to them that were not fulfilled, lied to them, reneged on any agreement or generally acted as in *Matter of 1555 Boston Road Corp.*, where the Court found that "it is not only egregiously unfair, but an act of effrontery, for the city to

here insist that it may renege on its agreement after the petitioner, in reliance on the settlement, failed to take legal steps, which it now cannot take, to challenge the assessment." 401 N.Y.S.2d at 539. Nor have the Debtors explained why they did not apply for rent increases pending the City's action. It appears that political pressure may have been brought on them in an effort to avoid rent increases, but the Debtors do not contend that this pressure created an estoppel on the City. *See* generally the cases in which the New York courts have held that the inadequacy of relief under the rent laws does not excuse the non-payment of a mortgage or estop another governmental agency from foreclosing on a secured loan. *New York State Mortg. Loan Enforcement and Admin. Corp. v. Arbor Hill Houses, Inc.*, 180 A.D.2d 926, 928–929, 580 N.Y.S.2d 538 (3d Dep't 1992), *lv. app. dismissed*, 80 N.Y.2d 925, 602 N.E.2d 1128, 589 N.Y.S.2d 312 (1992), *lv. app. denied*, 83 N.Y.2d 752, 633 N.E.2d 489, 611 N.Y.S.2d 134 (1994); *New York State Mortgage Loan Enforcement and Admin. Corp v. Coney Island Site Five Houses, Inc.*, 109 A.D.2d 311, 491 N.Y.S.2d 671 (2d Dep't 1985), *appeal dismissed*, 67 N.Y.2d 1049, 495 N.E.2d 357, 504 N.Y.S.2d 1024 (1986).

Nor have the Debtors separately attempted to support their Fifth and Sixth Objections to the City's Proofs of Claim, asserting defenses of "unclean hands" and "laches." These principles are in any event considered under the general rubric of estoppel. *Frye v. Comm. Of Finance*, 62 N.Y.2d 841, 843–844, 466 N.E.2d 151, 477 N.Y.S.2d 611, 612–613 (1984); *See also McMahan v. State Tax Comm.*, 45 A.D.2d 624, 627, 360 N.Y.S.2d 495, 498 (3d Dep't 1974), *appeal denied*, 36 N.Y.2d 646, 371 N.Y.S.2d 1028, 332 N.E.2d 363 (1975).[8]

In sum, on the instant record the City is not estopped by general principles of estoppel or by the equitable principles of laches or "unclean hands" from a claim for taxes payable by the Debtors in accordance with the sliding scale exemption of the 1968 Amendment. The Debtors profess astonishment that the parties would intend to use an exemption that had not been in force for the 14 years between 1970 and 1984. Yet that is the result, contractually, of the termination of successive "shelter rent" exemptions that first superceded the sliding scale exemption in July 1, 1970 and then remained in effect, *seriatim*, for a specific number of years thereafter.

The foregoing is not to hold that the Debtors are without any remedy, an issue not before the Court. They may be able to get some administrative relief for rent increases under the rent stabilization laws. Moreover, the Original Agreement contained a provision that permitted a trustee in an insolvency proceeding to apply directly to the City Comptroller for a rent increase to which the development companies were entitled, circumventing the Board of Estimate altogether. While the 1982 Amendment eliminated any jurisdiction of the Board of Estimate over the Debtors' rents, the jurisdiction of the Comptroller may still survive. The Court expresses no opinion as to whether the Debtors would have any such recourse, at this late date, to attempt to raise rents retroactively; this issue involves the rights of third parties (tenants). But the fact that some possible recourse did exist, but was never pursued, as well as the lack of specificity in the Debtors' papers as to the precise effect of the loss of the shelter rent tax exemptions, weakens their appeal to equity.

*The Imposition of Interest*

■ While the statutory and contractual record is sufficiently clear to enter summary judgment on the City's claim for taxes and to overrule the Debtors' objections, the record is not nearly as clear as

---

**8.** There is no statute of limitations applicable to the City's claim for taxes. *L.K. Land Corp. v. Gordon*, 1 N.Y.2d 465, 470–471, 136 N.E.2d 500, 503–504, 154 N.Y.S.2d 32 (1956), *cert. denied*, 352 U.S. 989, 77 S.Ct. 387, 1 L.Ed.2d 368 (1957).

to the City's assessment of interest. As indicated, much of the City's claim is made up of interest, not taxes, which is not surprising in view of the accrual of interest at a rate of 18% per annum, compounded daily. *See* NYC Admin. Code §§ 11–224(h) and 11–123. Under the New York City Charter, § 1520, the Commissioner of Finance is directed to "charge, receive and collect the interest and penalties upon taxes on real estate not paid when due and payable in such manner and at such rates as shall be provided by law." The right of the City to collect interest thus depends on whether the claim is "due and payable" on a certain date. The Administrative Code provides in § 11–224(f) that interest accrues from the date the taxes "become due and payable," as follows:

> If any tax on real estate which shall become due and payable at any time on or after July first nineteen hundred seventy-nine, shall remain unpaid in whole or in part on the fifteenth day following the date on which the same shall become due and payable . . . the commissioner of finance shall charge, receive and collect interest upon the amount of such tax or such part thereof remaining unpaid . .

*See also,* §§ 1519 and 1520 of the New York City Charter; RPTL § 922(3).

The record contains the August 1991 opinion of the Deputy Commissioner for Legal Affairs of the Department of Finance, quoted from extensively above, that there are difficulties in assessing taxes where certain information must be sent to the Department of Finance from HPD or other City agencies after the due date of July 1. The letter continued, "Given the above situation, the Department of Finance does not treat the taxes of a subject housing company as 'due and payable' for the purpose of charging interest until such taxes are calculated and placed upon the City's records, and the housing company is billed for the taxes." The City's papers attempt to limit the scope and effect of this letter, but it has cited no legal authority contradicting the conclusions of the Depu-

ty Counsel of its own Finance Department. The Debtors claim in their reply papers that they received the Salas letter in the fall of 1991 from the City and relied on the assurances of the City representatives "that no interest and/or penalties would be due on the tax years 1985 and later."

The record is not sufficiently clear as to when, if ever, the taxes payable by the Debtors were "calculated and placed upon the City's records" in order to trigger the imposition of interest. That alone would require the denial at this time of the City's motion for summary judgment to the extent it seeks the imposition of interest. The Debtors should also be able to argue that the City is estopped to collect interest. For its part, the City is entitled to be heard as to how and when the Debtors received the Salas letter and whether and for what period they may have been entitled to rely on it. *See generally, Boyar v. the City of New York,* 89 Misc.2d 607, 392 N.Y.S.2d 356 (Civ.Ct. Kings Co.1977) (where the City's mistaken claim of ownership of the property and refusal to mail tax bills resulted in the taxpayer being relieved of payment of interest on back taxes); *contra, TSNB, Inc. v. City of New York,* 127 Misc.2d 285, 287–288, 485 N.Y.S.2d 687 (Sup.Ct.N.Y.Co.1985), where the court found that the City was not estopped from collecting interest on unpaid taxes despite an agreement between the City and plaintiff's predecessor.

The Debtors also contend that some or all of the interest may constitute a penalty that should be invalidated or subordinated under the Bankruptcy Code. Since further proceedings are required with respect to the issue of interest, any other issues relating to interest are reserved for further proceedings.

*Extension of the Period of Tax Exemption*

 In their Ninth Objection to the City's proofs of claim, the Debtors argue that the period of their tax exemption was extended from 25 years, as provided in the Original 1959 Agreement, to 40 years, by virtue of a 1969 amendment to section 125

of the PHFL. In the version of section 125 in effect in 1959, the period of tax exemption could not exceed 25 years. In 1969 the statute was amended to provide that "with respect to a project which is or is to be permanently financed by a federally-aided mortgage, the tax exemption shall operate for so long as the mortgage is outstanding, but in no event for a period of forty years . . . ." McKinney's N.Y. Session Laws, L.1969, c. 1121 § 2. It appears that two of the Debtors have a mortgage issued by the Federal Department of Housing and Urban Development, although the Debtors have not put the mortgages in the record on the instant motion, and it is not clear as to how long the mortgages have been or will be "outstanding".

■■■■ The question whether a statutory amendment should be applied retroactively or, more precisely in this case, should govern preexisting contracts, is in the first instance one of legislative intent. The question is whether the State intended to affect existing contracts, assuming it could do so without violating a Constitutional proscription. The courts of New York have held that unless the legislative intent is clear that existing contracts were to be affected, the statute will not be applied to them. As the New York Court of Appeals held in *Wolf v. Roosevelt*, 290 N.Y. 400, 402, 49 N.E.2d 502, 503 (1943),

> Even within the narrow field where legislative power to nullify or change an existing agreement is unchallenged, *a statute restricting the power of individuals to create or define their rights and obligations should not be construed in manner which would affect existing* agreements unless the Legislature so provided in express terms or by plain implication. (emphasis added)

This rule is an application of the well-settled presumption in New York against the retroactivity of statutory amendments. *Carr v. Marietta Corp.* 211 F.3d 724, 730 (2d Cir.2000); *Hitchens v. Pentair,* 1997 WL 578754, *3–6 (W.D.N.Y.1997); McKinney's Cons.Laws of N.Y., Book 1, Statutes § 52.

The Debtors have provided no support for the proposition that the legislature intended that the 1969 amendment be applied "retroactively" or be applied to preexisting contracts.[9] The City has cited a 1969 opinion of the State Board of Equalization and Assessment which held specifically that the 1969 amendment was not applicable to existing contracts, relying on the familiar presumption against retroactivity. See 2 Op. Counsel S.B.E.A. No. 72.[10] In the absence of any indication that the New York legislature intended the amendment to apply to existing contracts or that Federal housing law required State statutes to so provide, the Court holds that it did not.

That was the position that both parties seemed to accept during the course of the contract and prior to the instant litigation. There is nothing in the record to indicate that the parties to the Original Agreement ever contemplated, in their post–1969 negotiations and amendments relating to tax exemptions, that the 1969 statutory amendment applied so as to lengthen the exemption period. On the contrary, the post–1969 amendments, like those that came before, stated that the Original Agreement would remain in full force and effect "except as expressly amended." The Original Agreement contained a 25–year tax exemption period, § 407, ¶ 2, and this was never "expressly awarded." The

---

9. The Debtors state in their papers that they were told in March, 1997 by unnamed City representatives that the 40–year period should apply to the Agreement. Debtors' Objections at ¶ 78. This vague, unsupported allegation is not sufficient to raise a triable issue on a motion for summary judgment. *Anderson v. Liberty Lobby, supra.*

10. The State Board of Equalization and Assessment, now known as the NYS Office of Real Property Services, has general supervision over tax assessment and the administration of the real property tax by counties, cities, towns, and villages. See RPTL § 202(1)(a-p).

1991 HPD proposal to the City Council, which the Debtors apparently endorsed, also states that the Debtors' tax exemptions would terminate in 1988, 1989 and 1992, respectively (in accordance with a 25–year period).

 This practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for a considerable length of time before it became the subject of controversy, is entitled to great, if not controlling weight in construction of the contract. *See Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.*, 743 F.2d 85, 91 (2d Cir.1984); *Viacom Int'l, Inc. v. Lorimar Productions, Inc.*, 486 F.Supp. 95, n. 3 (S.D.N.Y.1980); *Crossroads Apartment Corp. v. City of Rochester*, 79 A.D.2d 1095, 1096, 435 N.Y.S.2d 840 (4th Dep't 1981) (shelter rent exemption case). The Debtors' Ninth Objection is overruled.

*Conclusion*

The Court finds that summary judgment should be granted in favor of the City and against the Debtors on the Debtors' First Objection (contract claims) and on their Second, Fifth and Sixth Objections (estoppel, unclean hands and laches). The City is directed to calculate the base taxes owed by the Debtors; the Debtors' Third, Seventh and Eighth Objections are reserved pending such calculation and any future proceedings needed to calculate the specific amounts of base taxes due. The Debtors' Fourth Objection (interest) is reserved and the parties are directed to consult with respect to any discovery needed on this issue and to contact chambers within 20 days to schedule a pre-trial conference. The Debtors' Ninth Objection (40–year period for tax exemptions) is rejected, as is the City's motion to dismiss on statute of limitations grounds. IT IS SO ORDERED.